[Cite as *State v. Banfield*, 2021-Ohio-2160.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellee

    v.

JEREMIE E. BANFIELD

    Appellant

C.A. No.    20CA011610

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    19CR101236

DECISION AND JOURNAL ENTRY

Dated: June 28, 2021

CARR, Judge.

{¶1}    Defendant-Appellant Jeremie Banfield appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms but remands the matter for a nunc pro tunc entry to correct the sentencing entry.

I.

{¶2}    In September 2019, an indictment was filed charging Banfield with one count of attempted burglary in violation of R.C. 2911.12(A)(2) and 2923.02(A). The allegations were based upon an attempted break in that occurred at a neighbor's house on August 15, 2019.

{¶3}    The matter proceeded to a bench trial, after which the trial court found Banfield guilty of the charge. The trial court sentenced Banfield to 30 months in prison. While the sentencing entry reflects that Banfield pleaded guilty to the charge, the transcripts in the record reflect that Banfield was tried to the court. The sentencing entry also states that a presentence report and investigation were completed; however, at sentencing, the trial court stated that it did

not request a report and there is no indication in the trial court record that either side requested one. The State's brief further confirms that a bench trial was conducted, and a presentence investigation was not. These clerical errors can be corrected by the trial court upon remand. *State v. Morgan*, 9th Dist. Summit No. 29490, 2020-Ohio-3955, ¶ 7.

{¶4} Banfield has appealed, raising four assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR ACQUITTAL UNDER CRIM.[R.] 29.

{¶5} Banfield argues in his first assignment of error that the State failed to present sufficient evidence as to whether Banfield intended to commit a criminal offense if he had made it inside the victim's home. Thus, he maintains that the trial court erred in denying his Crim.R. 29 motion.

{¶6} Crim.R. 29(A) provides, in relevant part:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

{¶7} When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶8} Banfield was found guilty of attempted burglary. R.C. 2911.12(A)(2) states that "[n]o person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense[.]" "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). R.C. 2923.02(A) provides that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." Thus, "[a] criminal attempt occurs when the offender commits an act that constitutes a substantial step toward the commission of an offense." *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 26.

{¶9} "[B]ecause a defendant's mental state is difficult to demonstrate with direct evidence, it may be inferred from the surrounding circumstances in the case." *State v. Weese*, 9th Dist. Summit No. 23897, 2008-Ohio-3103, ¶ 13. With respect to the crime of aggravated burglary, this Court has stated that, "[w]hen a person trespasses in an occupied residence by means of force, stealth, or deception, the intent to commit a criminal offense can be inferred." *State v. Myers*, 9th Dist. Summit No. 23853, 2008-Ohio-1913, ¶ 7. We believe a similar inference concerning intent

can be made in cases involving attempted burglary. *See State v. Ortiz*, 6th Dist. Lucas No. L-14-1251, 2016-Ohio-974, ¶ 19, 23.

{¶10} The victim's house was located in Columbia Station. She moved to the house in March 2019. At the time she had only spoken to her neighbor to the north, Brandi Basch, a couple of times. Banfield was living with Ms. Basch at the time of the events, but the victim had not seen him before. The victim's house was situated behind the detached garage. That day, the victim's car was parked in the garage. At the backside of the garage is a window, from which the victim's car would have been visible. Along the north side of the driveway, several 6- to 7-foot-high bushes separated the victim's driveway from her neighbor's. A 6-foot-high fence with a latched gate bordered three sides of the property and came up to the corner of the detached garage on the side nearest to Ms. Basch's house. The victim testified that she was not aware if the gate was open or closed on the date of the incident; however, she normally kept it closed. Ms. Basch's house also had a fenced in yard with a latched gate. Her latched gate was adjacent to the victim's latched gate. The victim acknowledged that, at least one time before, a toy had ended up in her yard and her husband had thrown it back into the neighbor's property.

{¶11} On August 15, 2019, the victim stayed home from work due to a migraine. That afternoon, the migraine subsided, and the victim was just relaxing and watching TV upstairs. The victim started to hear some noises, but thought it was just the rain hitting the skylight. A few minutes later, she started hearing noises coming from the back of the house. When the sounds got closer, she went downstairs to investigate. She peaked around the corner and did not see anyone by the front door. Then, when the victim looked outside, she saw someone standing on the back deck, with his hands cupped over his eyes, peering through the window. In that area were two sliding doors: an inner glass door, and an outer screen door. Those doors were completely

opposite from the location of the victim's driveway. The victim described the man as Hispanic, 5'8" to 5'9" in height and between 190 to 200 pounds. The victim had never seen him before. The man did not have gloves or a mask or tools. She observed him for 3 to 5 seconds. When the man reached for the inner sliding glass door, the victim yelled out and asked what the man was doing. The man startled and then turned and walked nonchalantly away. The victim ran upstairs and called 911.

{¶12} The victim later noticed that the outer screen door had been opened. The victim testified that she kept both doors locked. Someone suggested that the victim check Ms. Basch's Facebook page as Ms. Basch had recently had her boyfriend move in with her. The victim was given the name Jeremie. When the victim went on Facebook, she saw a photo of Banfield, whom she recognized as the intruder.

{¶13} When police arrived, officers began looking for the suspect fitting the description provided by the victim. The officers went door to door and drove through the neighborhood. Deputy Christopher Folley with the Lorain County Sheriff's Office went to the victim's immediate neighbors. When Deputy Folley went to Ms. Basch's home, no one answered the door. No suspects were located that day. Police also looked for fingerprints but did not see anything that would be usable. Samples for DNA testing were not taken as the incident would not meet the lab's criteria for testing. Deputy Damian Rodriguez, also with the Lorain County Sheriff's Office, was also at the crime scene. He observed the sliding doors where the victim saw Banfield. Deputy Rodriguez testified that the locking mechanism on the outer screen door would have been easy to circumvent even without tools. He also testified that when he looked at the outer screen door it was in the locked position despite the fact that the door was open. He indicated that that would be the position the door would be in if someone would have forced it open while it was locked.

{¶14} The next day, the victim informed police that a neighbor across the street had surveillance video of Ms. Basch on the victim's property. The victim also showed police the photos of Banfield she found on Facebook.

{¶15} The neighbor across the street from the victim had a video camara in her front window for security reasons. It recorded at all times and the data was stored in the cloud. Following the attempted burglary, the neighbor became aware that police wanted to check the video to see if it had recorded anything of interest. The neighbor invited the officer in and brought up the video and "tried to see if there was anything on it about the time they got a 911 call." She later provided the video to the police. The video, which was admitted into evidence, depicts Ms. Basch leaving her property and walking up the victim's driveway to her front door. Ms. Basch appears to remain at the front door for almost a minute before proceeding around behind the garage and disappearing from view for several more seconds. It is not clear where Ms. Basch went. The neighbor noted that bushes obscure the view of the gate, which is near the corner of the back of the garage. The neighbor believed that, given the time that Ms. Basch disappeared behind the garage, Ms. Basch could have made it to the gate. Ms. Basch then reenters the frame, walks back towards the street, crosses it, and disappears from view for a few seconds. Ms. Basch is then seen returning to her property.

{¶16} On November 16, 2019, Banfield made a call from the jail, which was recorded, and a portion was played at trial. In that call, one of the parties, whose voice appears to be that of Banfield, states that he never tried to open her door and also states that he is going to go with the truth, which was that it was him there.

{¶17} Viewing the evidence in a light most favorable to the State, we conclude that sufficient evidence was presented, if believed, that Banfield possessed the requisite criminal intent.

There was evidence that, around the time of the 911 call, Ms. Basch approached the victim's house and waited near the victim's front door for about a minute. Ms. Basch then disappeared from view for enough time to reach the victim's fence gate and then went back to her property. The victim heard noises outside her house and went to investigate. While she saw no one at her front door, she observed Banfield outside her back door. She yelled when he reached for the inner glass door. Banfield then turned and walked away. Police investigation discovered that the locked outer screen door had been opened, which would require some amount of force to open.

{¶18} Thus, there was evidence that Banfield went around to the back door of the victim's house, which would have been shielded from view from the street. The video, which depicts the victim's front yard, does not depict Banfield. Therefore, it also appears that Banfield entered the victim's property from a different direction. In addition, there was evidence that Banfield peered into the victim's house, opened the locked screen door, and then left the scene when discovered. A trier of fact could reasonably conclude that these actions supported the conclusion that Banfield possessed the requisite criminal intent. *See Myers*, 2008-Ohio-1913, at ¶ 7; *Ortiz*, 2016-Ohio-974, at ¶ 19, 23. While Banfield argues that there was no evidence as to the time the neighbor's video was taken, we note that Banfield did not object to the admissibility or consideration of the video in any way. *See State v. Zepeda-Ramires*, 9th Dist. Lorain No. 12CA010275, 2013-Ohio-1224, ¶ 7, 11. In addition, the neighbor did testify that she "tried to see if there was anything on it about the time they got a 911 call." Thus, it would be reasonable for a trier of fact to conclude that Ms. Basch was outside the victim's house at some point relatively close in time to the time of the 911 call, and the time that Banfield was fleeing the victim's property.

{¶19} Banfield's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY WHEN THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶20} Banfield argues in his second assignment of error that the finding of guilt was against the manifest weight of the evidence. Essentially, Banfield asserts that his conduct was more consistent with innocent behavior.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶21} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶22} After a thorough and independent review of the record, we cannot say that the trier of fact lost its way in finding Banfield guilty of attempted burglary. While individually certain portions of Banfield's behavior may have been viewed as innocent, taken together, it was not unreasonable for the trier of fact to conclude that Banfield's intentions were criminal. Notably, there was evidence from the victim and police that Banfield opened a locked screen door in the course of events. Banfield has not demonstrated that the finding of guilt is against the weight of the evidence.

{¶23} Banfield's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED BY HOLDING APPELLANT'S CONSTITUTIONAL RIGHT TO REMAIN SILENT AGAINST HIM IN ITS DELIBERATION AND FINDING OF GUILT.

{¶24} Banfield argues in his third assignment of error that the trial court erred by holding Banfield's right to remain silent against him in rendering the verdict.

{¶25} The comments at issue were made when the trial court informed the parties of its verdict. The trial court's discussion of its verdict spanned well over 15 pages and the comments at issue were isolated and brief. They occurred while the trial court was discussing Deputy Folley's investigation. The trial court stated:

> I find that, at a minimum, Ms. Basch was next door when Officer Folley canvassed the neighborhood, and I think it's fair to conclude that Mr. Banfield was there as well, but, at the very least, that she was there, and that she failed to respond to the knocking. And the relevance from that standpoint is, there's been some suggestion that there may be some innocent explanation for this. I think there was a description, at least during the opening statement, and maybe during [the victim's] testimony, that toys or other items had come over from one person's lawn to the other. And that's not surprising. I experienced that a lot with mean neighbors when I was a child, that wherever my baseball went, it almost certainly would go into my neighbor's property, and they didn't like us walking on their property. So I found that that was reasonable, and a reasonable argument made in that regard. My difficulty in that regard is, if there was a reasonable or innocent explanation for Mr. Banfield being over there, it was best served to have been provided to Officer Folley when he arrived on the scene to explain an innocent explanation as to why Mr. Banfield would have been on the back porch at the time he was discovered by [the victim].

{¶26} It is true that "use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, syllabus. And without a doubt, the trial court's comments were less than ideal. Nonetheless, the comments occurred in the midst of a very lengthy discussion of the trial court's rationale as to why it found Banfield guilty, which included a thorough discussion of the

admitted evidence and the law. The comments were isolated and when carefully reviewed, it is not even clear that the trial court believed that it was Banfield who should have provided police with an explanation. Notably, the trial court stated that it was only clear that Ms. Basch was home at the time and that she failed to respond to the knocking. When the trial court stated that, "if there was a reasonable or innocent explanation for Mr. Banfield being over there, it was best served to have been provided to Officer Folley when he arrived on the scene to explain an innocent explanation as to why Mr. Banfield would have been on the back porch at the time he was discovered by [the victim][,]" the trial court could have just as easily been referring to Ms. Basch, as the trial court does not name the person that should have provided that explanation.

{¶27} Given the foregoing, we conclude that Banfield has failed to demonstrate that the trial court's actions amounted to reversible error. Banfield's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED BY CONSIDERING EXTRAJUDICIAL INFORMATION IN SENTENCING APPELLANT, RESULTING IN A MORE PUNITIVE SENTENCE.

{¶28} Banfield argues in his fourth assignment of error that the trial court erred by considering extrajudicial information in sentencing him. Specifically, he maintains that, by considering the State's discovery file, the trial court improperly considered extrajudicial information, which resulted in a more punitive sentence. Banfield acknowledges that he did not object to this and is thus limited to arguing plain error. *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 217. However, Banfield has not developed a plain error argument. *See* App.R. 16(A)(7).

{¶29} Irrespective, Banfield has not demonstrated that the trial court relied on extrajudicial information in sentencing him. At the beginning of the sentencing hearing, the trial

court noted that a presentence investigation report was not completed. The trial court then stated that it "reviewed the State's discovery further to make sure the Court was aware of, at least broadly, the defendant's prior record." Notably, the State filed, as part of Banfield's discovery request, a document that included Banfield's criminal record. Thus, Banfield's criminal record was part of the record in the proceedings. In fact, Banfield's criminal record was discussed at the sentencing hearing by both the State and the defense. Near the end of the sentencing hearing, the trial court did state that, it was making its decision based upon a "review of the materials contained in the State's discovery and any matters presented at this sentencing hearing and during the Court trial with regard to this matter * * *." However, Banfield has not demonstrated that the foregoing statement means that the trial court considered anything other than Banfield's criminal record, which was part of the trial court record. Further, even if the trial court had considered something in the discovery file outside of Banfield's record, it is not clear what that would be. Thus, Banfield's argument is speculative at best; any other information that the trial court may have considered from the discovery file could also have been filed as part of the record.

{¶30} Banfield has failed to demonstrate that the trial court committed plain error in sentencing him. Banfield's fourth assignment of error is overruled.

III.

{¶31} Banfield's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed, but the matter is remanded for the issuance of a nunc pro tunc entry as outlined above.

Judgment affirmed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

STEPHEN P. HANUDEL, Attorney at Law, for Appellant.

J. D. TOMLINSON, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.